IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARIO JOHNSON,

                Plaintiff,

        v.

JENNIFER SPIVEY, personal and official capacities; MOLLY STRONG, personal and official capacities,

                Defendants.

Case No. 3:16-cv-00620-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

Mario Johnson ("Plaintiff"), a self-represented litigant, brings this 42 U.S.C. § 1983 action against two child caseworkers employed by the Oregon Department of Human Services ("DHS"), Jennifer Spivey ("Spivey") and Molly Strong ("Strong") (together, "Defendants").[1]

---

[1] The Court dismissed Plaintiff's claims against DHS in an Order dated May 26, 2016. (ECF No. 11.) That Order also dismissed claims brought by Plaintiff's mother, Janice Newton ("Newton"), and noted that Newton's claims would be dismissed with prejudice unless an amended complaint was filed that cured certain deficiencies. (*Id.*) The Court granted Plaintiff and Newton more than sixty days' leave to amend, but they never filed an amended complaint. (*See* ECF Nos. 14, 21; *cf.* Am. Mem. Opp'n Mot. Summ. J. at 28, asking for Newton to be added "as an active Plaintiff in this matter," *id.* Ex. 2, at 1, indicating that Newton's declaration refers to herself as a "Plaintiff in this case").

Plaintiff asserts constitutional and state law claims against Defendants based on actions they took during the course of juvenile dependency proceedings involving Plaintiff's minor child. Defendants now move for summary judgment on Plaintiff's claims. *See* FED. R. CIV. P. 56. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. All parties consent to U.S. Magistrate Judge jurisdiction pursuant to FED. R. CIV. P. 73(b). (ECF No. 42.) For the reasons explained below, the Court grants Defendants' motion for summary judgment.

## BACKGROUND[2]

In May 2012, DHS received a cross-report from law enforcement alleging that Plaintiff had locked his two-year-old son ("WM") and WM's mother in a hotel room in Gresham, Oregon, for several days, during which time he sexually assaulted WM's mother. (Decl. Jennifer Spivey Supp. Defs.' Mot. Summ. J. 3, ECF No. 57 (hereinafter "Spivey Decl.").) The report also alleged that, while in the presence of WM, Plaintiff strangled WM's mother and broke her cell phone when she attempted to leave. (*Id.*) Plaintiff later fled to Washington with WM. (*Id.*) In response, WM's mother obtained a restraining order against Plaintiff and coordinated with Washington law enforcement officials, who recovered WM. (*Id.*)

DHS opened a Child Protective Services ("CPS") investigation after receiving law enforcement's cross-report. (*Id.* ¶ 8.) During the course of the CPS investigation, DHS coordinated with law enforcement and learned that Plaintiff allegedly began a sexual relationship with WM's mother when she was fifteen years old, that Plaintiff trafficked WM's mother, and that Plaintiff was under criminal investigation for sex trafficking. (*Id.*) DHS also learned that WM's mother was "working as an exotic dancer with an unpredictable schedule and appeared to be abusing substances," and that WM's mother was "involved in a sexual relationship with an

---

[2] Unless otherwise noted, the following facts are either undisputed or viewed in the light most favorable to Plaintiff.

individual who had gang affiliations, a history of methamphetamine use, and . . . multiple children in DHS'[s] legal custody because he had been unable to parent them safely." (*Id.* ¶ 9.) WM's mother, however, "refused to take steps to limit that individual's contact with WM." (*Id.*)

On August 28, 2012, after DHS identified an individual who was able to provide substitute care for WM, DHS filed a dependency petition in Multnomah County Juvenile Court. (*Id.* ¶ 10.) During a hearing held that same day, the juvenile court found that there was probable cause to believe that WM was within the court's jurisdiction (*i.e.*, it was in WM's best interests to be in DHS's temporary legal custody because his circumstances endangered his welfare). (*Id.* ¶ 11.)

On October 22, 2012, the juvenile court took jurisdiction of WM with respect to his mother because WM's mother "did not appear." (*Id.* ¶ 12.) On or about October 26, 2012, Spivey was assigned to work on the juvenile dependency case involving WM. (*Id.* ¶ 3.) During the months that followed, Plaintiff did not visit WM, did not attend a November 2012 child safety meeting (*i.e.*, a meeting between the parties to the juvenile dependency case and their attorneys), and frequently did not return calls from DHS employees, including Spivey.[3] (*Id.* ¶ 13.)

On January 10, 2013, DHS filed an amended dependency petition in juvenile court. (*Id.* ¶ 14.) The amended petition added two new allegations regarding Plaintiff: (1) WM had "been in care" since August 2012 and Plaintiff "had failed to keep in contact with DHS since then," and (2) Plaintiff knew about "safety concerns" regarding WM's mother, "including her chaotic lifestyle and her involvement in criminal activities, but had done nothing to assert custody" of WM. (*Id.*)

---

[3] Plaintiff denies failing to keep in touch with Spivey and DHS, failing to attend meetings, and failing to set up visits with WM. (Am. Decl. Mario Johnson Opp'n Defs.' Mot. Summ. J. 2, ECF No. 74-1 (hereinafter "Johnson Decl.").)

On January 24, 2013, the juvenile court held a hearing and took jurisdiction of WM with respect to Plaintiff based on Plaintiff's stipulation regarding the new allegations set forth in the amended petition. (*Id.* ¶ 15.) Plaintiff was represented by counsel at this time. (*See id.* Ex. 8, at 1 (identifying "Attorney for Father").) DHS was not able to establish jurisdiction based on WM's mother's allegations of sexual abuse and domestic violence because WM's mother was reportedly "afraid of the potential for [P]laintiff's reprisals" and thus was not willing to testify. (*Id.* ¶ 15.) As a result, the juvenile court dismissed the allegations regarding sexual abuse and domestic assault. (*Id.*) In a dependency judgment, the juvenile court ordered Plaintiff to "enroll in parenting classes, 'hands on if possible,' maintain regular visitation with the child, maintain contact with DHS and keep the agency advised of current contact information at all times, and sign releases of information in favor of DHS regarding his services." (*Id.*) The juvenile court also ordered DHS to provide Plaintiff with gas money to assist him in traveling from Washington to attend visits with WM. (*Id.*)

On February 14, 2013, Spivey requested (through the Interstate Compact on the Placement of Children) that the Washington Department of Social and Human Services ("WDSHS") perform a home study to assess whether WM's visits could be set up at Plaintiff's home in Washington. (*Id.* ¶ 17.) On March 14, 2013, WDSHS declined Spivey's request, noting, *inter alia*, that Plaintiff "had not engaged in parenting classes or visitation with WM," that Plaintiff needed to be "in full compliance with parenting classes and visitation," and that Plaintiff needed to undergo "a psychological evaluation, a domestic violence assessment, and sexual deviance evaluation." (*Id.*)

Plaintiff attended seven out of the twelve visits arranged by DHS in 2013. (*Id.* ¶ 18.) In addition, he "was between 10 and 25 minutes late to three of them." [4] (*Id.*) Plaintiff also enrolled in parenting classes in 2013, but his attendance failed to rise to the level necessary to "'officially complete the class,'"[5] and DHS was never able to verify whether the class was "appropriate or 'hands on'" because Plaintiff failed to comply with the juvenile court's order to sign a release of information ("ROI") in favor of DHS. (*Id.* ¶ 19.)

During regularly scheduled review hearings held on May 9 and October 7, 2013, the juvenile court determined that Plaintiff "was not safe enough to care for WM," that the visits that had taken place were not in "WM's best interests," and that "DHS had made reasonable efforts to reunify [P]laintiff and WM." (*Id.* ¶ 20.) The juvenile court also set a hearing for November 22, 2013, to address a motion filed by Plaintiff's newly retained counsel, which contested the juvenile court's jurisdiction and argued that Plaintiff had made sufficient efforts to reunite with WM. (*Id.* ¶ 21.) WM, through his attorney, filed a memorandum opposing Plaintiff's motion, noting Plaintiff's "poor progress in reconnecting with WM through visits," insufficient completion of parenting classes, and failure to complete the evaluations requested by WDSHS. (*Id.* ¶ 22.)

On November 18, 2013, Spivey informed law enforcement that Plaintiff was expected to attend a juvenile court hearing that week, and she "asked for information relevant to that hearing." (*Id.* ¶ 24.) Spivey was later informed that WM's mother was now willing to testify

---

[4] Plaintiff asserts that he missed only "three visitations, one because of work conflict and two because [he] was hospitalized for a month." (Johnson Decl. ¶ 7.)

[5] Plaintiff asserts that he completed parenting classes and provided his attorney a certificate of completion. (Johnson Decl. ¶¶ 7, 9.)

against Plaintiff. (*Id.*) On November 22, 2013, Plaintiff was arrested before the scheduled hearing. (*Id.*)

On January 4, 2014, DHS filed a second amended dependency petition in juvenile court based on WM's mother's willingness to testify. (*Id.* ¶ 25.) The second amended petition included allegations that Plaintiff was "incarcerated and unable to be a custodial resource," that Plaintiff's "criminal lifestyle interferes with his ability to safely parent" WM, and that Plaintiff had "engaged in a pattern of domestic violence towards the mother, including physical abuse and forcing her to engage in prostitution as a minor, some of which occurred in front of" WM. (*Id.* Ex. 16, at 1.)

DHS's second amended dependency petition "continued to pend without adjudication through the winter, spring, and summer of 2014." (*Id.* ¶ 26.) That was due in part to the fact that, during several regularly scheduled review hearings, the juvenile court elected to postpone trial on the petition in order to accommodate Plaintiff's criminal proceedings. (*Id.*) During one of those review hearings, Plaintiff accused Spivey of "providing false information to cause him to be arrested," and he asserted that DHS's case involving WM "was premised on false information." (*Id.*)

Plaintiff's criminal trial took place in June and July 2014.[6] (Decl. Jesse B. Davis Supp. Defs.' Mot. for Summ. J. Ex. 1, at 2 (hereinafter "Davis Decl.").) A jury convicted Plaintiff of attempting to promote prostitution, strangulation constituting domestic violence, assault

---

[6] Defendants ask the Court to take judicial notice of court filings from Plaintiff's criminal proceeding. (Defs.' Mot. Summ. J. at 6 n.2.) Plaintiff does not oppose the request. It is appropriate to take judicial notice of court filings. *See Fairbank v. Underwood*, 986 F. Supp. 2d 1222, 1227 n.2 (D. Or. 2013) (stating that a court may take judicial notice of court filings and other matters of public record). Accordingly, the Court grants Defendants' request to take judicial notice of the filings from Plaintiff's criminal proceeding, which are attached as Exhibits 1-6 to the Jesse Davis Declaration, ECF Nos. 60-1 to 60-6.

PAGE 6 – OPINION AND ORDER

constituting domestic violence, interference with making a report, and perjury. (*Id.* Ex. 6, at 1-2.) The jury acquitted Plaintiff on charges of rape in the first degree and sexual abuse in the first degree and could not reach a verdict on two counts of kidnapping, one count of attempting to compel prostitution, one count of attempting to promote prostitution, and one count of coercion constituting domestic violence. (*Id.* Ex. 4, at 1-3, Ex. 6, at 4.) Spivey asserts that she did not testify or play any part in Plaintiff's trial, nor did she "participate in the initiation or continuation of criminal proceedings" against Plaintiff. (Spivey Decl. ¶ 27.) On September 29, 2014, Plaintiff appeared for his sentencing hearing. (Davis Decl. Ex. 1, at 2.) On January 16, 2015, the court entered judgment sentencing Plaintiff to 30 months' incarceration in the custody of the Oregon Department of Corrections ("ODOC"). (Davis Decl. Ex. 6, at 1.)

On July 24, 2014, Spivey transferred WM's case to a different caseworker. (*Id.* ¶ 3.) Spivey "had no involvement of any kind on the matter" after that point. (*Id.*) On October 14, 2014, Strong was assigned to work on the juvenile dependency case involving WM. (Decl. Molly Strong Supp. Defs.' Mot. Summ. J. 3, ECF No. 58 (hereinafter "Strong Decl.").)

On January 12 and January 13, 2015, Plaintiff appeared for the trial on the juvenile court dependency petition. (*Id.* ¶ 11.) WM's mother and an expert witness testified at the trial. (*Id.*) On January 26, 2015, the juvenile court took jurisdiction with respect to Plaintiff and found that the following "allegations and/or facts" were true: (1) WM's "conditions and circumstances . . . are such as to endanger his own welfare or the welfare of others," which is supported by the fact that Plaintiff "is incarcerated and unable to be a custodial resource," Plaintiff's "criminal lifestyle interferes with his ability to safely parent the child," WM "was exposed to domestic violence perpetrated by" Plaintiff, and Plaintiff "poses a significant risk of future domestic violence which places the child at risk of harm," and (2) WM has not been provided "with the care, guidance,

and protection necessary for [his] physical, mental, or emotional well-being," which is supported by the fact that Plaintiff "is incarcerated and unavailable as a custodial resource." (Strong Decl. ¶ 11, Ex. 1, at 2, 7.)

On February 12, 2015, Plaintiff appeared for a permanency hearing before the juvenile court. (*Id.* ¶ 12.) The juvenile court entered a Permanency Order that same day, which required Plaintiff to "participate in a psychological evaluation, batterer's intervention, and sign releases of information in favor of DHS." (*Id.* ¶ 12, Ex. 2, at 2.) The juvenile court's Permanency Order also stated that DHS had made "reasonable efforts" to reunite WM with his family, but that Plaintiff had "not made sufficient progress" toward meeting the requirements imposed on him. (*Id.* Ex. 2, at 3.)

On March 23, 2015, Strong contacted Tanyia Beal ("Beal"), Plaintiff's institutional counselor at Oregon State Correctional Institution ("OSCI"). (*Id.* ¶ 13; Decl. Tanyia Beal Supp. Defs.' Mot. Summ. J. 1, ECF No. 59 (hereinafter "Beal Decl.").) Strong faxed a cover letter to Plaintiff "explaining the two enclosures which were ROIs and informing him that the judge had ordered him to complete a psychological evaluation prior to the next court hearing." (Strong Decl. ¶ 13.) One ROI pertained to the evaluation, which Strong had scheduled. (*Id.*) The other ROI "allow[ed] for the exchange of information between DHS and OSCI[,]" enabling Strong to work with Beal to provide Plaintiff "access to any parenting information or other resources and services." (*Id.* ¶ 13, Ex. 3, at 3-5.)

Plaintiff met Beal for the first time on March 25, 2015. (Beal Decl. ¶ 6.) Beal gave Strong's letter to Plaintiff, as well as the two ROIs, and told Plaintiff that signing the ROIs was his choice and "would have no impact on his incarceration." (*Id.*) Plaintiff, whom Beal describes as "adamant and volatile[,]" refused to sign and requested that Beal send Strong the following

PAGE 8 – OPINION AND ORDER

message: "[p]er judge's orders and my attorney's request, I was supposed to have a say in what doctor was used. I won't sign the releases of information because there is nothing for her to know that is her business."[7] (*Id.* ¶ 7.) Beal emailed Strong advising her of Plaintiff's refusal to sign and relaying Plaintiff's message as an exact quotation. (Strong Decl. Ex. 4.)

Strong responded the same day and attached a letter of expectation for Plaintiff to "further clarify court ordered services and expectations." (Strong Decl. Ex. 5, at 1.) Beal then emailed to ask whether she needed to review the letter with Plaintiff, and Strong responded that Beal "could instead refer plaintiff to his attorney." (Strong Decl. ¶ 16, Ex. 6, at 1.) On April 1, 2015, Strong sent Beal an ROI for Plaintiff's psychological evaluation, this time to be conducted by an African American psychologist, per Plaintiff's request. (*Id.* ¶ 17, Ex. 7, at 1-3.) Later that day, Strong emailed Beal "inquiring about services available to plaintiff for parenting classes or anger management or any other relative courses or supports within OSCI." (*Id.* ¶ 18, Ex. 8.)

On April 1, 2015, Beal participated in an OSCI Multi-Disciplinary Team ("MDT") meeting. (Beal Decl. ¶ 13.) The MDT decided Plaintiff's security classification should be increased, which change made Plaintiff ineligible for short-term transitional leave. (*Id.*) Beal asserts that the MDT based its decision on "information relating to an incident that occurred in January 2015, before [Plaintiff] was transferred to OSCI[]" and not on Plaintiff's "refusal to sign the documents sent by DHS, anything said or done by Ms. Strong, or anything having to do with DHS in any respect." (*Id.* ¶¶ 13-14.)

---

[7] Plaintiff asserts that he refused to sign because his lawyer was not present to advise him and because the psychologist was chosen by the State and would "make a determination based on what the Defendant wanted him to say." (Johnson Decl. ¶ 16.)

Plaintiff met with Beal in her office on April 2, 2015. (*Id.* ¶ 10.) Beal provided the new ROI, which Plaintiff again refused to sign, stating he wanted to speak to his attorney.[8] (*Id.*) Beal describes Plaintiff's demeanor during the meeting as "agitated and volatile" and "threatening to the point where staff started to stand near my office to offer assistance as needed." (*Id.*) Plaintiff told Beal not to call him to her office again, and Beal and surrounding staff ordered Plaintiff to return to his cell. (*Id.*) Plaintiff "continued to make comments but eventually complied . . . ." (*Id.*) Such behavior, Beal asserts, "closely approached the level that ha[s] resulted in starting disciplinary procedures . . . ." (*Id.*)

The same day, Beal emailed Strong to inform her that Plaintiff had refused to sign the new ROI and wanted to speak to his attorney. (Strong Decl. Ex. 9.) Beal also emailed Strong to inform her that she would not recommend Plaintiff for OSCI's voluntary parenting program, which decision she made "for the safety of the parenting program instructor and the other inmates in the classroom[]" based on Plaintiff's behavior during his interactions with Beal. (*Id.* ¶ 11.) Strong then forwarded that and the previous email exchanges with Beal to Plaintiff's attorney in the juvenile dependency case. (Strong Decl. ¶ 20, Ex. 10, at 1-2.)

On May 6, 2015, the juvenile court held a second permanency hearing. (*Id.* ¶ 27.) The juvenile court entered a Permanency Order the same day, which stated that Plaintiff had not made "sufficient progress" and that WM could not be "safely returned to father's care." (*Id.* Ex. 11, at 3.) The juvenile court's Permanency Order changed the case plan from reunification (*i.e.*, reuniting WM with one or both of his parents) to adoption. (*Id.* Ex. 11, at 4-5.) The Permanency Order further required termination of parental rights petitions to be filed by June 15, 2015. (*Id.*

---

[8] Plaintiff asserts that Strong actually sent Beal "parental rights termination documents" for Plaintiff to sign. (Johnson Decl. ¶ 17.)

PAGE 10 – OPINION AND ORDER

Ex. 11, at 5.) Strong filed petitions to terminate the parental rights of Plaintiff and WM's mother on August 14, 2015. (*Id.* ¶ 28.)

Plaintiff was released from ODOC custody on October 15, 2015, but "failed to stay in contact with [Strong] after his release."[9] (*Id.* ¶ 29; Beal Decl. Ex. 1 (listing Plaintiff's housing history with ODOC).) On December 16, 2015, the juvenile court held a pre-hearing conference on the termination of parental rights petition filed against Plaintiff. (Strong Decl. ¶ 30.) Plaintiff did not appear. (*Id.* Ex. 12, at 1.) The juvenile court, proceeding without Plaintiff, found by clear and convincing evidence that termination of Plaintiff's parental rights was in the "best interests" of WM and entered a judgment terminating Plaintiff's parental rights to WM. (*Id.* Ex. 12, at 1-2.)

## ANALYSIS

### I. STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

---

[9] Plaintiff asserts that he "suffered a great deal of hardship" when he returned home to Washington, including homelessness, unemployment, post-traumatic stress disorder, and other health issues. (Johnson Decl. ¶ 18.)

## II. DISCUSSION

### A. Introduction

As a preliminary matter, the Court must interpret Plaintiff's complaint liberally because Plaintiff is a self-represented litigant. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (holding a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers"). However, the Court will not "manufacture arguments" for Plaintiff. *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) (waiving an appellant's claim "due to his failure to present a specific, cogent argument for our consideration"). Furthermore, the Court will not address claims raised for the first time in Plaintiff's opposition to Defendants' motion for summary judgment (ECF No. 74), or attached declaration (ECF No. 74-1).[10] *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 965 (9th Cir. 2006) (finding that a district court need not address allegations raised for the first time in a response to a motion for summary judgment where the plaintiff's "pleadings did not provide sufficient notice of those allegations"); *see also Jacobsen v. Filler*, 790 F.2d 1362, 1364-65 (9th Cir. 1985) ("*[P]ro se* litigants in the ordinary civil case should not be treated more favorably than parties with attorneys of record.").

In his complaint (ECF No. 1), Plaintiff left blank the sections under each claim instructing him to "[s]tate what right under the Constitution, laws, or treaties of the United States has been violated." (Compl. at 4, 7.) Plaintiff did submit several pages of facts. After a careful review of Plaintiff's complaint, his factual allegations against Spivey and Strong that fairly can be said "to state a claim upon which relief can be granted" are as follows: Plaintiff accuses Spivey of (1) making false statements about him, enabling DHS to obtain wrongful jurisdiction over WM (Compl. at 3), (2) coercing him into accepting court-ordered services in order to regain

---

[10] The Court noted in a Minute Order dated March 8, 2018 (ECF No. 80), that it will treat ECF Nos. 74 & 74-1 as Plaintiff's operative opposition papers.

custody of WM (*id.* at 4), (3) causing his false arrest (*id.* at 5), and (4) improperly contacting his family members (*id.* at 7). Plaintiff accuses Strong of preventing his early release from prison. (*Id.*) He alleges that his refusal to sign the ROIs Strong sent to him "resulted in the abrupt denial of [his] early release . . . ." (*Id.*) Those are the allegations the Court will address herein.[11]

## B. Section 1983 Claims

### 1. Plaintiff's False Arrest and Malicious Prosecution Claims Are Impermissible Collateral Attacks of State Court Proceedings.

#### a. *Heck v. Humphries*

The Court interprets Plaintiff's first two allegations against Spivey as claims of false arrest and malicious prosecution in violation of the Fourth Amendment. Plaintiff does not connect his allegations to legal theories of recovery in his complaint, but appears to frame them as substantive due process violations in his opposition. (Am. Mem. Opp'n Mot. Summ. J. at 17-18.) Regardless of how they are framed, the claims are impermissible collateral attacks of state court criminal proceedings.

Plaintiff claims that Spivey caused him to be falsely arrested and maliciously prosecuted by informing law enforcement that he would appear at a juvenile court hearing on November 22,

---

[11] The Court will not address, for example, 42 U.S.C. §§ 1981, 1985, or 1986, which Plaintiff lists on the civil cover sheet to his complaint (ECF No. 1-1). Plaintiff does not provide facts in support of any claims arising under those statutes.
    Similarly, the Court will not address Plaintiff's state law tort claim against an unnamed person for "breach of fiduciary duty for ignoring my request for legal assistan[ce] and injunctive relief from the judge to cease and desist the unlawful state arbit[r]ary action . . . ." (Compl. at 6.) Plaintiff must do more than invoke statutes and legal buzzwords, and he must name a specific defendant as responsible for the violations he alleges. *See Pliler v. Ford*, 542 U.S. 225, 231 (2004) ("District judges have no obligation to act as counsel or paralegal to *pro se* litigants.").
    Finally, the Court will not address Plaintiff's Fourth Amendment claim, brought for the first time in his opposition papers. (ECF No. 74.) Plaintiff states in a heading that "[t]he unreasonable seizure [of his son] constitutes a Fourth Amendment violation" but does not explain the factual basis for his claim. (*Id.* at 21-22.) Plaintiff must do more than state legal conclusions to survive a motion for summary judgment. *See* FED. R. CIV. P. 56(c)(1)(A) (requiring the party asserting a factual dispute to "cit[e] to particular parts of materials in the record").

2013, and he was arrested at the court before the hearing. (*See* Johnson Decl. ¶ 19 ("She was the driving force that caused the false juvenile dependency proceedings and my false arrest, with regards to the false charges initiated against me, due to her phone [call] to the detective . . . .").) Plaintiff ultimately was convicted of five criminal charges. (Davis Decl. Ex. 1, at 2.)

In *Heck v. Humphrey*, the Supreme Court held that, "when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." 512 U.S. 477, 487 (1994).

Here, for Plaintiff to prevail on his false arrest and malicious prosecution claims, he would have to demonstrate that there was no probable cause to arrest him. *Dubner v. City & Cty. of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001) ("A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification."); *Mazzetti v. Bellino*, 57 F. Supp. 3d 1262, 1268 (E.D. Cal. 2014) ("Probable cause is an absolute defense to a malicious prosecution claim."). However, Plaintiff's convictions give rise to a presumption of probable cause for his arrest and prosecution. *See Heck*, 512 U.S. at 484 n.4 ("[T]he presumption of probable cause arising from a conviction can be rebutted only by showing that the conviction had been obtained by some type of fraud[.]"); *Guerrero v. Gates*, 442 F.3d 697, 703-04 (9th Cir. 2006) (holding that *Heck* barred wrongful arrest and malicious prosecution claims, where the § 1983 plaintiff had been convicted). Therefore, a judgment in favor of Plaintiff here necessarily would imply the invalidity of his state convictions.

Plaintiff does not allege that his convictions were obtained by fraud. Furthermore, Plaintiff does not allege that his convictions have been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus[.]" *Heck*, 512 U.S. at 486-87. Thus, because a judgment in Plaintiff's favor on his false arrest and malicious prosecution claims necessarily would imply the invalidity of his convictions, which have not already been invalidated, the Court must enter judgment on those claims pursuant to *Heck*.

### b. *Rooker-Feldman* Doctrine

Plaintiff alleges that Spivey caused the juvenile court to establish jurisdiction over WM with respect to him by falsely accusing him of failing to notify CPS that WM was in danger while in his mother's care. (Compl. at 3; Johnson Decl. ¶¶ 5, 9.) The Court interprets Plaintiff's allegation as a claim for wrongful initiation of civil proceedings. Defendants assert that this claim, as well as all remaining claims, are barred by the *Rooker-Feldman* doctrine.[12] (Defs.' Mot. Summ. J. at 21-24; *see also* Reply Mem. Supp. Defs.' Mot. Summ. J. at 8-9.) The Court disagrees.

Under the *Rooker-Feldman* doctrine, federal district courts lack subject matter jurisdiction to hear direct and *de facto* appeals of final state court judgments. *See Noel v. Hall*, 341 F.3d 1148, 1154-55 (9th Cir. 2003). A *de facto* appeal exists "when the plaintiff in federal district court complains of a legal wrong allegedly committed by the state court, *and* seeks relief from the judgment of that court." *Id.* at 1163 (emphasis added). "Once a federal plaintiff seeks to bring a forbidden de facto appeal . . . that federal plaintiff may not seek to litigate an issue that is

---

[12] The *Rooker-Feldman* doctrine takes its name from two Supreme Court cases, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983).

PAGE 15 – OPINION AND ORDER

'inextricably intertwined' with the state court judicial decision from which the forbidden de facto appeal is brought." *Id.* at 1158 (quoting *Feldman*, 460 U.S. at 486).

The *Rooker-Feldman* bar is inapplicable to Plaintiff's claims because Plaintiff has not brought a direct or a *de facto* appeal of the juvenile court judgment against him. To be sure, Plaintiff claims that the juvenile court committed a legal wrong, the first element of a *de facto* appeal. (*See* Compl. at 3; Am. Mem. Opp'n Mot. Summ. J. at 7, 27; Johnson Decl. ¶ 9.) However, Plaintiff does not seek relief from the juvenile court judgment terminating his parental rights to WM, the second element of a *de facto* appeal. (*See* Compl. at 9 (listing Plaintiff's claims for relief and not seeking to reverse the termination of his parental rights).) Therefore, contrary to Defendants' argument, the *Rooker-Feldman* doctrine does not bar Plaintiff's wrongful initiation of civil proceedings claim or any other related claims here, regardless of whether those claims are inextricably intertwined with the juvenile court judgment against Plaintiff. *See Noel*, 341 F.3d at 1158 ("The federal suit is not a forbidden de facto appeal because it is 'inextricably intertwined' with something. Rather, it is simply a forbidden de facto appeal. Only when there is already a forbidden de facto appeal in federal court does the 'inextricably intertwined' test come into play[.]").

### 2. Plaintiff's Remaining Claims against Spivey Are Barred by the Applicable Statute of Limitations.

Plaintiff brings three additional claims against Spivey, all of which are time-barred. First, as previously discussed, Plaintiff brings a wrongful initiation of civil proceedings claim. Second, Plaintiff alleges that Spivey told him she would "request the dismissal" of his criminal charges if he agreed to surrender his parental rights to WM and convince his family members to stop

seeking custody of WM.[13] (Compl. at 7.) Third, Plaintiff alleges that Spivey contacted his family and friends "asking questions and attempting to incite inflammatory and incriminating subject matter against me and stating 'that until I give up my efforts I will be treated harshly.'" (*Id.*) Plaintiff does not connect the latter two allegations to legal theories, but to the extent he states a claim for relief, he brings any such claim and his wrongful initiation of civil proceedings claim outside the applicable statute of limitations.

Section 1983 contains no specific statute of limitations, and therefore federal courts apply the forum state's statute of limitations for personal injury actions. *Maldonado v. Harris*, 370 F.3d 945, 954-55 (9th Cir. 2004). In Oregon, the applicable statute of limitations for a 42 U.S.C. § 1983 action is two years from the date upon which the cause of action accrues. *See Sain v. City of Bend*, 309 F.3d 1134, 1139 (9th Cir. 2002); *see also* OR. REV. STAT. § 12.110(1) ("An action . . . for any injury to the person or rights of another, not arising on contract, and not especially enumerated in this chapter, shall be commenced within two years . . . ."). The accrual date for a § 1983 cause of action "is a question of federal law that is not resolved by reference to state law." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). "Under federal law, a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Lukovsky v. City and Cty. of S.F.*, 535 F.3d 1044, 1048 (9th Cir. 2008) (quotations and citation omitted); *see also Dyniewicz v. U.S.*, 742 F.2d 484, 486-87 (9th Cir. 1984) (holding that a plaintiff's claim

---

[13] Plaintiff clarifies in his opposition (ECF No. 74-1) that Spivey made those statements on the record at a permanency hearing and off the record in a conference room immediately following that hearing. (Johnson Decl. ¶ 13.) He asserts that his allegations would be proven by transcripts or audio of the hearing, which he alleges Defendants withheld from him during discovery. (*Id.*) Defendants did not provide hearing transcripts because they were not "within DHS'[s] possession, custody, or control." (*See* ECF No. 74-29.) Plaintiff had sufficient time to obtain and inspect those records from the juvenile court itself. (*See* ECF Nos. 61 & 72 (Minute Orders extending Plaintiff's time to respond to Defendants' motion for summary judgment).)

accrued for the purpose of the statute of limitations when the injury and the cause of the injury were discovered).

Here, Plaintiff discovered his alleged injury and its cause more than two years before commencing this action on April 16, 2016. (Compl. at 1.) On January 10, 2013, DHS filed the amended dependency petition in juvenile court alleging that Plaintiff knew that WM was unsafe in his mother's care but did not assert custody of WM himself. (Spivey Decl. ¶ 14.) The juvenile court took jurisdiction over WM with respect to Plaintiff on January 24, 2013. (*Id.* ¶ 15.) Plaintiff was arrested on November 22, 2013. (*Id.* ¶ 24.) Spivey last contacted Plaintiff's family members "no later than the end of 2013." (*Id.* ¶ 29.) DHS filed a second amended dependency petition on January 4, 2014, alleging that Plaintiff's incarceration and "criminal lifestyle" prevented him from parenting WM safely. (*Id.* ¶ 25, Ex. 16, at 1.) Finally, on February 5, 2014, at a review hearing in juvenile court, Plaintiff accused Spivey on the record of "providing false information to cause him to be arrested and [alleged] that DHS'[s] juvenile case was premised on false information." (*Id.* ¶ 26, Ex. 17, at 2.) Plaintiff's own allegations demonstrate that he was aware in February 2014 (at the latest) that Spivey caused his alleged injuries.

The record is clear that Plaintiff commenced this action more than two years after discovering his alleged injuries and their alleged causes. Plaintiff makes no assertions to the contrary. Plaintiff's remaining claims against Spivey accrued more than two years before Plaintiff filed this case, and therefore the claims are barred by the applicable two-year statute of limitations. Accordingly, Spivey is entitled to summary judgment on any remaining claims.

### 3. Plaintiff Fails to Demonstrate a Material Factual Dispute as to Any Claims Against Strong.

Plaintiff alleges that Strong attempted to use Beal to mislead him into signing legal documents that would "voluntarily surrender [his] legal rights." (Compl. at 6.) He asserts that he

PAGE 18 – OPINION AND ORDER

had earned and was approved for an early release from prison: "In fact[,] my prison counselor was cordially assisting and finalizing the process, until the defendant Molly Strong's arbit[r]ary intrusion . . . ." (*Id.* at 7.) Plaintiff further alleges that his "refusal to sign the documents presented by Ms. Strong resulted in the abrupt denial of [his] early release . . . ." That, Plaintiff contends, "constitut[es] a First Amendment retaliation" claim. (*Id.*)

Plaintiff has not demonstrated a genuine issue of material fact to support any federal constitutional claim or state law claim against Strong. The record is clear that Strong was merely attempting to assist Plaintiff in complying with the juvenile court's order that he undergo a psychological evaluation. (*See* Strong Decl. ¶ 12, Ex. 2, at 2.) The three documents Strong forwarded to Beal for Plaintiff's signature were ROIs for the exchange of information between DHS and OSCI, and between DHS and the doctors scheduled to complete Plaintiff's psychological evaluation. (*Id.* ¶¶ 13, 17.) Signing those documents could not have resulted in the termination of Plaintiff's parental rights. (*Id.* ¶ 22.) In fact, the opposite is true. The juvenile court changed WM's case plan from reunification to adoption because Plaintiff had "not made sufficient progress toward meeting the expectations set forth in the service agreement, letter of expectation and/or case plan . . . ." (Strong Decl. ¶ 27, Ex. 11, at 3-5.) Nor did Plaintiff's refusal to sign the documents make him ineligible for short-term transitional leave. Rather, his ineligibility was the result of the MDT's decision to increase Plaintiff's security level after an incident that occurred in January 2015, at least two months before Strong first sent ROIs for Plaintiff to sign. (Beal Decl. ¶¶ 13-14.)

Plaintiff does not "set forth specific facts" or "present affirmative evidence" refuting the factual record before the Court. *Anderson*, 477 U.S. at 256-57. Plaintiff has not presented any

facts to support a federal constitutional or other claim against Strong, and therefore Strong is entitled to summary judgment.

### C. Section 1988 Claim

Plaintiff is not entitled to attorney's fees under 42 U.S.C. § 1988(b), which allows attorney's fees to the "prevailing party" in civil rights proceedings, for two reasons. First, Plaintiff is not a prevailing party. Second, even if Plaintiff were a prevailing party, the Supreme Court has held that § 1988 is inapplicable to self-represented litigants. *Kay v. Ehrler*, 499 U.S. 432, 437-38 (1991). Accordingly, the Court denies Plaintiff's request for attorney's fees.[14]

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment (ECF No. 56).

**IT IS SO ORDERED.**

DATED this 18th day of July, 2018.

_____
STACIE F. BECKERMAN
United States Magistrate Judge

---

[14] To the extent Plaintiff has alleged any state law claims not addressed herein, the Court declines to exercise supplemental jurisdiction over those claims in light of the dismissal of Plaintiff's federal claims. *See* 28 U.S.C. § 1367(c)(3).